**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. _____**

**GAVINO LUCERO,**

   *Plaintiff,*

*v.*

**SAFEWAY INC.,**
**a Delaware Corporation, and;**

**ALBERTSONS COMPANIES, INC.,**
**a Delaware Corporation;**

**EVAN RAINWATER,**

**TODD BRODERICK,**

**ARTURO LOPEZ,**

**ALLEN QUINTANA,**

**LORI DOGGETT,**

**AGUSTIN JARAMILLO,**

**KURT HODGES,**

**SEAN HALEY,**

**DANIEL MALAGON,**

**CHINEDU NWOKERIE,**

**TODD BAXTER,**

**ISAAC GARCIA,**

**STEFANIE STARK,**

**DAVID MONTOYA,**

**RHONDA TAYLOR,**

**JUAN MARTINEZ,**

**BRENT THIEMAN,**

**FRANK TALMADGE,**

**VIC KING,**

**KRYS ELBAUM,**

**EDAR CHAVEZ,**

**JAFARI KITWANA,**

**JOE TORRES,**

   ***and***

**John Does 1-20.**

   ***Defendants.***

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

NOW COMES Plaintiff Gavino Lucero ("Plaintiff"), by and through undersigned counsel, and for his Complaint against Defendants Safeway Inc., Albertson's Companies, Inc., Evan Rainwater, Todd Broderick, Arturo Lopez, Allen Quintana, Chinedu Nwokerie, Lori Doggert, Agustin Jaramillo, Kurt Hodges, Sean Haley, Daniel Malagon, Todd Baxter, Isaac Garcia, Stefanie Stark, David Montoya, Rhonda Taylor, Juan Martinez, Brent Thieman, Frank Talmadge, Vic King, Krys Elbaum, Edar Charvez, Jafari Kitwana, Joe Torres and John Does 1-20 (collectively "Defendants" or the "Enterprise"), states and alleges as follows:

## NATURE OF THE ACTION

Plaintiff brings this suit under federal and state laws following investigation by the Equal Employment Opportunity Commission ("EEOC") that resulted in dismissal and a notice of right to sue granted to Plaintiff. Plaintiff now timely acts upon the right to sue by bringing this action alleging discrimination, retaliation and a hostile work environment under the Americans with Disabilities Act Amendments Act of 2008. 42 U.S.C. §§ 12102-12213. ("ADA"), pursuant to the Family Medical Leave Act 29 U.S.C. §2601 *et seq* ("FMLA"), Colorado Anti-Discrimination Act §§ 24-34-301 *et seq*., ("CADA"). Plaintiff further brings suit under

Plaintiff brings this action to address and remedy Defendants' wrongful activities occurring at the Safeway Denver Distribution Center including intentional harm Plaintiff suffered during his employment at the facility. Defendants, both individually and as part of a continuing common scheme, engage in discrimination and retaliation meant to discourage employees from utilizing any form of medical leave or disability accommodation. Inc. a subsidiary of Albertson's Companies, Inc.—a company which became publicly traded via initial public offering on or about June 24, 2020. Defendant Safeway[1] which resulted in a dismissal and issuance of a right to sue letter to Plaintiff that Plaintiff received within 90 days of filing this Complaint.[2] Plaintiff was

---

[1] Safeway is the only Defendant in this matter who was included on the EEOC charge of discrimination. This charge was filed without the assistance of counsel.

[2] The operations of the EEOC are abnormal at this time due to COVID-19 causing its procedures to be altered in ways that result in unclear methods by which a charging party is deemed to have "received" a notice of right to sue. The agency is not engaging in its usual practice of mailing a notice of right to sue to the charging party via U.S. Mail. The notice of dismissal and right to sue issued for Plaintiff's charge of discrimination to the EEOC was never received by Plaintiff, including not by U.S. mail at his home address, and was not made available on the EEOC online portal on the until on or after September 26, 2020 at the earliest. The District of Colorado recognizes that "[w]hen the date the plaintiff received the EEOC right to sue letter is unknown, a rebuttable presumption arises that the right to sue letter was received within three to five days after it was issued by the EEOC. *See, e.g., Federspill v. Denver Pub. Sch.,* 17-CV-01480-WJM-STV,

diagnosed with psoriatic arthritis in 2009 and experienced increasing discrimination, harassment, retaliation, .

## PARTIES

- **Parties**

1.     **Plaintiff Gavino Lucero** is and was at all relevant times a resident of the State of Colorado, Adams County employed in various positions at the Safeway Denver Distribution Center from December 1, 1999 to November 26 or 27, 2019.

2.     **Defendant Safeway Inc.** ("Safeway") is a foreign corporation incorporated in the State of Delaware with its principal office in the State of California and registered to do business in the State of Colorado, with business operations that include distribution of goods from the Denver Distribution Center warehouse in the State of Colorado to retail locations for sale to the public in various Colorado and other States.

3.     **Defendant Albertson's Companies, Inc.** ("ACI") is a foreign corporation incorporated in the State of Delaware with its principal office in the State of Idaho and registered to do business in the State of Colorado. ACI is engaged in the business operations of Safeway taking place in Colorado due to its ownership of Safeway. ACI engaged in an initial public offering in Summer 2020 but to Plaintiff's knowledge neither Safeway nor ACI was publicly traded during his employment.

4.     **Defendant Evan Rainwater** is and was at all pertinent times a resident of the State

---

2018 WL 6051335, at *13 (D. Colo. Sept. 12, 2018), *report and recommendation adopted*, 17-CV-1480-WJM-STV, 2018 WL 4846507 (D. Colo. Oct. 4, 2018); *see also Lupia v. Medicredit, Inc.*, 445 F. Supp. 3d 1271, 1282 (D. Colo. 2020).

of California and executive level employee of Defendant Safeway as Group Vice President Supply Chain, Distribution, Manufacturing, Logistics from 2014 to 2020, as well as Senior Vice President and GM of Manufacturing for Albertsons from 2015 to 2020.

5. **Defendant Todd Broderick** is and was at all pertinent times a resident of the State of Colorado and management-level employee of Safeway and Albertsons serving as President of the Denver Division of Albertson's Companies, Inc. since 2016.

6. **Defendants Arturo Lopez, Allen Quintana, Chinedu Nwokerie, Lori Doggett, Agustin Jaramillo, Kurt Hodges, Sean Haley, Daniel Malagon, Todd Baxter, Isaac Garcia, Stefanie Stark, David Montoya, Rhonda Taylor Juan Martinez, Brent Thieman, Frank Talmadge, Vic King, Krys Elbaum, Joe Torres** and **Jafari Kitwana**, each of them individually, were at all pertinent times   residents of the State of Colorado employed by Defendant Safeway in the County of Denver, Colorado.

7. **Defendants John Doe 1-20** (the "Doe Defendants") are individuals, sole proprietorships, partnerships, corporations, trusts, or any other legal entities or chartered unions, associations, and/or groups of individuals who are associated in fact although not a legal entity—the precise identities of which such Does are unclear at this time.

## JURISDICTION

- **Personal Jurisdiction**

8. Personal jurisdiction exists over Defendant Safeway due to its continuous operations at the Denver Distribution Center which establish the company is engaged in business within the State of Colorado and voluntarily availed of its laws. Safeway has been in continuous business operation at the Denver Distribution Center located at 4600 E Stapleton Drive South in

the City and County of Denver, Colorado 80216 for over 65 years. Safeway is also engaged in interstate commerce originating from this facility. The Denver Distribution center serves as a vital part of Safeway's business operations which is open 24 hours a day, 7 days a week, and most holidays. It distributes items to locations in Colorado, Wyoming, South Dakota, Nebraska and New Mexico.[3]

9.      Personal jurisdiction exists over Defendant ACI due to the business operations of it's subsidiary Defendant Safeway including the Denver Distribution Center. "As of September 12, 2020, the Company operated 2,252 retail food and drug stores with 1,725 pharmacies, 398 associated fuel centers, 22 dedicated distribution centers and 20 manufacturing facilities. The Company operates stores across 34 states and the District of Columbia under 20 well-known banners including Albertsons, Safeway, Vons, Jewel-Osco, Shaw's, Acme, Tom Thumb, Randalls, United Supermarkets, Pavilions, Star Market, Haggen and Carrs."[4]

10.      **Warehouse worker** Defendants Arturo Lopez (Forklift Operator), Allen Quintana (Forklift Operator), Chinedu Nwokerie (Inventory Clerk), Daniel Malagon (Order Selector), Rhonda Taylor (Receiving Clerk), Stefanie Stark (Human Resources Business Partner) are and were at all relevant times to Plaintiff's claims against them employees of Defendant Safeway at the Denver Distribution Center who held warehouse worker positions, not in positions of authority

---

[3] Safeway Denver Distribution Center (last retrieved Dec. 23, 2020), ("The Safeway Denver Distribution Center opened in 1954 and "[t]hrough several remodels, it has expanded to 1,524,000 sq. ft. under roof") *available at* https://www.safewaydenverdc.com/home.

[4] Albertsons Companies, Inc. Reports Second Quarter Results (Oct. 20, 2020) (last retrieved December 23, 2020) *available at* https://investor.albertsonscompanies.com/news/press-release/2020/Albertsons-Companies-Inc.-Reports-Second-Quarter-Results/default.aspx

over nor otherwise with decision-making authority over Plaintiff's work or employment.

11.     **Management level** Defendants Lori Doggett (Human Resources Manager), Agustin Jaramillo (District Asset Protection Manager), Kurt Hodges (Operations Manager), Sean Haley (Perishables Manager), Todd Baxter (Asset Protection Manager), Juan Martinez (Supervisor) and Krys Elbaum (Produce Supervisor), Jafari Kitwana (Union Steward) William Archuleta (Union Steward) and/or certain John Doe Defendants acted as managers who had authority to affect the terms and conditions of Plaintiff's employment in certain ways

12.     **Executive level** Defendants subject to Plaintiff's claims include Evan Rainwater and Todd Broderick. Defendant Rainwater is subject to this Court's jurisdiction due to his "reict accountability for leading competitive best in class cost, and quality facilities" including the Denver Distribution Center.[5] In his role with Safeway, he was responsible for budgetary, quality and service expectations at Safeway. These duties relate directly to the Defendants' Enterprise as described below.

13.     To any extent that Defendant Safeway's associated business entities or its parent corporation Defendant ACI may be later deemed a proper party in interest, their use of the Denver Distribution Center for business purposes also cause these organizations to be subject to the jurisdiction of this Court.

-   **Subject Matter Jurisdiction**

14.     Private citizen lawsuits arising under FMLA are under exclusive jurisdiction of

---

[5] *See* Evan Rainwater LinkedIn Profile (last accessed December 23, 2020) *("*Utilizing comprehensive strategies and tactics that embed a lean operating culture, complemented with automation, and a strong focus on innovation. Responsible for a 2.5 billion dollar annual budget and over 8,500 employees.") *available at https://www.linkedin.com/in/evan-rainwater-749516b/.*

federal courts. Plaintiff alleges herein that Defendant violated FMLA and seeks remedies available under FMLA. Plaintiff thus presents a federal question over which this Court has jurisdiction.

15.     At all relevant times, Defendant was an employer within the meaning and purview of said statutes.

16.     At all relevant times, Defendant Safeway employed over 50 persons at the Denver Distribution Center and was thus a covered employer under FMLA and required to adhere to FMLA as to all covered employees working at this location.

17.     Jurisdiction of this court is invoked pursuant to the provisions of the aforementioned statutes. This court has supplemental jurisdiction as codified in 28 U.S.C. §1331.

18.     Venue is proper in this judicial district under 28 U.S. C. §1391.

**- Supplemental Jurisdiction**

19.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims arising under the laws of the State of Colorado, including under statutes, regulation, and common law as against Defendants, each and all of them, and specifically Plaintiff's claims for violations of CADA, CROCC the Outrageous Conduct; Intentional Infliction of Emotion Distress; because plaintiff's claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.

20.     These claims subject to supplemental jurisdiction arise from and/or share the same nucleus of operative fact: Plaintiff being damaged by Defendants' wrongful actions including Defendant acting as an enterprise.

21.     Supplemental jurisdiction thus exists over all claims which share the same nucleus of operative fact as Plaintiff's claims under the ADA.

-   **Venue**

22.     Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the alleged FMLA violations, ADA violations, CADA violations, other unlawful employment practices and all wrongful conduct of Defendants toward Plaintiff subject of the claims alleged herein occurred at the Denver Distribution Center within the State of Colorado.

23.     The employment records relevant to the alleged unlawful employment practice are maintained and administered at this location. Plaintiff and all or nearly all witnesses to the facts and allegations stated herein are located in the State of Colorado.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

24.     Plaintiff timely filed a charge of discrimination against defendant with the Equal Employment Opportunity Commission (EEOC) on November 16, 2019 followed by an amended charge on December 4, 2019. Plaintiff files this complaint within 90 days after receiving a notice of the right to sue from the EEOC. A copy of the notice of the right to sue is attached as **Exhibit 1.**

25.     The EEOC failed to send Plaintiff a right to sue letter to Plaintiff via U.S. Mail. Plaintiff   only discovered the existence of the notice of the right to sue in October 2020 by logging in to the EEOC online portal to investigate the status of the investigation. The earliest possible date the dismissal letter and accompanying notice of right to sue letter were made available on the EEOC portal was September 26, 2020—not the date stated on the notice of right to sue document itself.[6]

---

[6] It is unclear why identical versions of this document were uploaded to the portal. Both were uploaded September 26, 2020. As of the date of this filing, the portal still contains the documents filed in the EEOC investigation. **Exhibit 2.**

26.     This lawsuit is properly filed within 90 days of to the notice of right to sue being made available.

27.     The Tenth Circuit has recognized since 2018 that exhaustion of administrative remedies is not a jurisdictional prerequisite to filing a lawsuit alleging employment discrimination and that an EEOC charge of discrimination is *not* required for a District Court to properly assume jurisdiction of a claimant's allegations of employment discrimination under Title VII of the Civil Rights Act of 1969. *See Lincoln v. BNSF Ry. Co*., 900 F.3d 1166, 1186 (10th Cir. 2018).

28.     Plaintiff's claims arising under CADA were to be included in the scope of the EEOC's investigation concerning Plaintiff's charge of discrimination. Plaintiff's signature appears on the charge immediately below text on the charge that states "I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures." *See* **Ex. 1.**

## CLAIMS PLEAD ARE EXCLUSIVE OF UNION GRIEVANCES

29.     Plaintiff filed grievances as a member the Teamsters Local Union No. 455 on several occasions in the months preceding his involuntary suspension and termination. The relief sought herein is not intended, at the time of filing, to be premised on violations of the contractual provisions within the Teamsters' Union Collective Bargaining Agreement with Albertson's/Safeway Inc. (the "CBA").

30.     Plaintiff understands a union grievance is currently set to be heard on or about May 2021.

31.     Plaintiff may elect to seek to have the union withdraw a grievances(s) subject to

arbitration due to his filing of a grievance if he desires to proceed with such claim in this matter or for any other reason. This arbitration is not and never will be mandatory, a fact reflected in the CBA.

32.    Conversely, Plaintiff may pursue any claim and remedy in this matter despite any claim by Defendant(s) that such claim is subject to arbitration.

33.    The Teamsters Union, not Plaintiff or Plaintiff's counsel in this matter, is pursuing the arbitration of grievances.

34.    There is no restriction preventing Plaintiff from stating or developing facts during this lawsuit even if such facts arguably relate to an arbitration matter between the Teamsters Union and Safeway.

35.    Plaintiff's right to seek withdrawal of arbitration at any point

36.    To the extent violations of the CBA or the terms of the CBA are referenced herein it is not intended to cause any claim, cause of action, or relief to be subject to arbitration between Teamsters Local Union No. 455 and Safeway Inc.

37.    Plaintiff did not and does not intend to waive any legal rights or remedies available to him in this lawsuit, and many of Plaintiff's claims herein could not properly be subject to such arbitration.

## **FACTS COMMON TO ALL CLAIMS**

- Defendants' Enterprise colluded to terminate Plaintiff

38.    Defendants named in this Complaint represent the individuals and entities known by Plaintiff to have played a dual role in causing him to suffer adverse employment actions and suffer damages. This dual role involved their individual wrongful actions toward Plaintiff as an employee or corporate entity, and on the other hand their collective wrongful actions toward Plaintiff as part of their common scheme to cause him harm.

39.    Plaintiff's claims against Defendants, both as individuals and collectively, concern the wrongful and illegal actions Defendants committed to purposefully discriminate, retaliate, create a hostile work environment, and actions which amount to negative employment actions that employment discrimination and retaliation under the ADA and CADA that the individual actions of Defendant's employees who engaged in different forms of illegal and prohibited activities while cooperating with one another in order to achieve a common goal of ending Plaintiff's employment but only after coordinating to create a false appearance his termination would be justified:

i)    **Warehouse workers** are individuals in blue collar positions without managerial authority. These individuals serve as the backbone of Defendants' 24/7/365 distribution operations often working 10 hour shifts without time to take breaks required by appliable laws should they wish to meet their daily quotas and avoid being assigned "points". Points accumulated and were used to punish and—through inconsistent enforcement—illegally retaliate against such employees, often in violation of applicable laws and regulations. Various Defendants in these positions chastised

Plaintiff for his serious medical condition / disability over the course of many years and thereby contributed to a hostile work environment. For instance, Defendants laughed and joked about plaques appearing on Plaintiff's skin. Management level Defendants relied on the false and defamatory reports of these Defendants to create a false justification claimed to support Plaintiff's termination. Defendants working in the warehouse provided verifiably false information concerning Plaintiff to superiors.

ii)   **Management level** including supervisors, human resources employees, union stewards, and managers who controlled or affected some aspect of Plaintiff's job duties in ways that violated many laws, controlled employee files including Plaintiffs while failing to adhere to recordkeeping requirements and falsified other documentation, and who were responsible for administering, investigating and enforcing Safeway's policies. Defendant employees in the management level engaged in concerted actions that evidence a common agreement to harm Plaintiff, to prevent him from obtaining legal protections or realizing his rights, and to engage in extensive retaliation against Plaintiff. Such actions created a hostile work environment in which verifiably false information was spread among all levels of employees with the aim of causing Plaintiff to quit and/or creating justification for terminating Plaintiff's employment. The false pretenses claimed to support these actions are so widespread, unjustified, and outrageous that Defendants' collective and individual liability therefor grew substantially through the actions of management-level Defendants; and,

iii)   **Executive level** employees including the President of operations and John Does to be identified. For many years such Defendants allowed or actively encouraged the

wrongful and illegal treatment Plaintiff and others were subjected to. This includes fostering a hostile and discriminatory work environment for anyone who interfered with obtaining the metrics and profits they desired—such as when employees requested protected medical leave or reported misconduct. Defendants ignored the authority of regulators, legislators and union contracts to focus on profits and efficient "lean" operations rather than the methods being utilized to harm Plaintiff in the name of such profits and operations. Defendants in this class had a high level of control over Plaintiff's workplace by exercising dominion over the entire warehouse.

iv)   **Corporate entitiy** Defendants Safeway and Albertsons as with responsibility for the other Defendants' actions, engaged with management and warehouse level Defendants to foster formation of a collective enterprise which in a readily discernible pattern conspired to commit and intentionally committed prohibited racketeering acts against Plaintiff and others who dared to interfere with Defendants' business operations by invoking the laws, regulations and contracts in place to protect from such abuses by employers.

40.   The sum of these four groups acting in concert amounted to an enterprise which over many years engaged in racketeering actions toward Plaintiff. Such actions resulted in him suffering substantial economic and non-economic damages, and causing remedies to be available for additional backpay, front pay, liquidated damages, exemplary damages, pre- and post-judgment interest, costs incurred and reasonable attorney fees incurred in pursuit of this action.

41.   In certain instances where Defendants falsified statements, memorialized incidents which never occurred, failed to create or preserve required records, and committed other wrongful

acts in Defendant Safeway's investigation of Plaintiff that led to his termination, individual Defendants will be required to rebut Plaintiff's evidence of his employment activities—which is demonstrably more accurate, consistent and reliable than the Defendants' business records and individual testimony.

42.     The intentional and outrageous nature of these individuals' actions and the collective harm Plaintiff suffered and continues to suffer as a result to this day provide support for extensive damages in an amount to be determined by a jury.

- Defendants' intentional conduct caused Plaintiff's wrongful termination in an outrageous and extreme manner

43.     Plaintiff was first hired by Defendant Safeway on or about December 1, 1999 when he was 19 years old. He worked continuously in the employment at Safeway through November 13, 2019 when he was wrongfully suspended and later wrongfully terminated on 26 or 27, 2019.

44.     Defendant was informed of his termination via a phone call received from Defendant Sean Haley.

45.     Plaintiff's termination was the culmination of a prolonged common scheme and agreement among Defendants that aimed to end Plaintiff's employment due to his need for intermittent leave due to a permanent immune disorder he developed ten (10) years after his date of hire by Safeway.

46.     The events and happenings of Plaintiff's final day of employment at the Denver Distribution Center exemplifies the wide-ranging types of negative discriminatory and retaliative actions Plaintiff suffered in his employment.

47.     The collective efforts and high number of persons involved in the coordinated scheme to create false justification for terminating Plaintiff's employment after nearly 20 years of

loyalty are shocking and truly outrageous conduct.[7]

48.     On November 13, 2019, Plaintiff turned in a union grievance to Human Resources at the beginning of his shift. This grievance related to Defendants' failure to honor requests for medical leave and the increasing retaliation he faced for requesting time off work due to his ongoing suffering from and treatment for psoriatic arthritis.

49.     Plaintiff worked nearly his entire shift without incident. Soon before the scheduled end of his shift, Safeway's management-level employees attempted to force Plaintiff into an interview for which he is guaranteed the right to be accompanied by a union representative; upon Plaintiff's insistence that he be granted such right to union representation Defendants informed him no meeting or interview was taking place and told Plaintiff without explanation that he was suspended; he was escorted from the premises and told he was forbidden from returning.

50.     Plaintiff then attempted to

51.     The outrageous nature of Defendants' tactics and despair resulting to Plaintiff is a years-long pattern of purposeful attacks by an employer and employees whose agreement and conspiracy to participate in illegal actions caused the Defendants to become racketeers intent upon ruining Plaintiff's livelihood, integrity, autonomy, mental and physical health, and basic human rights due to his legitimate need for intermittent medical leave stemming from an incurable

---

[7] Plaintiff notes that he was subject to termination five (5) days prior to the 20th anniversary of his date of hire by Safeway. Plaintiff believes this played a role in causing Defendants to desire to terminate his employment so that Plaintiff would not be entitled to certain additional benefits and bonuses, including his yearly vacation allowance increasing to five (5) weeks and other specific items he would have gained entitlement to under policies or contractual terms as of December 2019 if his employment had continued. Plaintiff will not make any presumption about the relative significance of the 20-year anniversary which he did not attain, and intends to seek additional information and documents from Defendants which will further inform his knowledge of the implications of this timing.

immune disorder—psoriatic arthritis

52.     Defendants' Enterprise grew over the course of many years beginning in 2009 when Plaintiff was first diagnosed with psoriatic arthritis. The Enterprise's methods evolved over time but always aimed to cause Plaintiff to lose his job with Defendant Safeway due to the Enterprise taking issue with the fact that Plaintiff took medical leave under the FMLA.

53.     Defendants' Enterprise agreed to attack Plaintiff's serious medical condition and cause Plaintiff's co-workers to believe his condition was a sham he used to take advantage of the state and federal legal system. Through the combined efforts of the individual Defendants, the Enterprise framed Plaintiff as a mentally unstable sociopath whom many coworkers feared was capable of committing mass murder without warning.

54.     The Enterprise succeeded in creating a false pretense the Defendants viewed as sufficient to end Plaintiff's employment.

-   Defendants' false documentation

55.     Plaintiff is eager to have his day in court and prove that Defendants' statements and documentation allegedly supporting Plaintiff's termination are verifiably false with documentary evidence and inconsistent prior statements. The investigative report authored by Defendant Agustin is

56.     Plaintiff became cautious of a perceived case being fabricated against him after years of enduring verbal harassment related to his condition and the time it necessitated that he miss from work due to extreme and long-lasting inflammatory responses caused by a disorder of his immune system.

57.     As he witnessed Defendants engaging in similar discrimination and retaliation to

what he witnessed be inflicted upon others throughout the course of his employment—simply for seeking to realize their legal rights and protections—Plaintiff determined to document his work activities with surgical precision in an effort to avoid the same result as Defendants' routinely caused to other employees at the Denver Distribution Center who did not know their rights or have the foresight to prevent Defendants from violating them. Plaintiff should not be able to provide a superior account of the events of his employment compared to Defendant Safeway absent gross mishandling of Plaintiff's employment records.

58.     Defendants will struggle to provide coherent and properly documented records supporting their false accounts of Plaintiff. They will not be able to demonstrate anything beyond selective enforcement of their rules and published standards for employee conduct. Defendants testimony will be inconsistent and self-defeating. The fragile evidence Defendant has to support its defenses to Plaintiff's claims herein is evident through Defendant's documentation and records provided in response to Plaintiff's EEOC charge and the investigation file related to Plaintiff's termination.

59.     Defendant Safeway's supervisors and managers overseeing Plaintiff's work have a long history of discouraging employees from engaging in lawful activity and retaliating against employees who took actions that management disapproved of. Plaintiff witnessed many co-workers face unlawful employment practices including numerous co-workers who voluntarily terminate their employment in order to avoid the harsh consequences imposed upon warehouse employees who could not keep up with the demands.

60.     Management routinely assigned daily work quotas so demanding that employees chose to forego restroom breaks. Persons who took medical leave often found their assigned job

bids obtained only after years spent obtaining seniority to vanish and be replaced with undesirable roles that in multiple instances led employees to voluntarily quit. Desirable roles with lower physical demands were replaced with intense physical labor and ten hour shifts with daily quotas for movement of materials set at such a high level that to stop and use the restroom was difficult to accomplish and still meet the day's quotas established by Defendant(s).

- **Plaintiff was coerced to refrain from the fundamental right of voting in multiple elections due to a wrongful denial of voting leave by Defendants' Enterprise.**

61.     Defendant Safeway's management level John Doe employee, Plaintiff's direct supervisor in or around the mid 2000's, denied Plaintiff's request to arrive later than his scheduled shift start time so that he could exercise his right to vote at a polling place. Plaintiff was told he would be penalized and receive points on his employee file if he was late to work on the upcoming election day.

62.     That is, Plaintiff directly requested to be able to arrive less than two hours late in order to exercise his fundamental right to vote. He did not vote in that election due to his supervisor's denial of his request. This created an enduring belief in Plaintiff such that Defendants' Enterprise acted to deny Plaintiff the opportunity to exercise a fundamental right and choose to work rather than vote in a number of elections from the mid-2000's through his termination.

63.     The law in Colorado has required that an employer grant up two hours of *paid* voting leave for any election, from municipal to national level. 1-7-102, 31-10-603, 31-10-1522(a) §§ C.R.S. Defendant Doe responded with a patently false answer that discouraged and coerced Plaintiff to refrain from voting in that election and a number of future elections. If Plaintiff's scheduled shift overlapped with the hours polling places were open, Plaintiff would refrain from

voting.

64.     The belief that he did not have a right to voting leave lasted through Plaintiff's termination.

65.     Plaintiff was thus wrongfully and illegally coerced by Defendant Safeway's management to refrain from exercising a fundamental right as an American citizen.

66.     Plaintiff is not aware of any employee at the Denver Distribution Center taking protected voting leave at any time. Plaintiff thereafter missed several opportunities to vote due to his scheduled shift day and time.

67.      he had to choose between exercising a fundamental right or facing consequences in his employment. This occurred prior to Plaintiff's diagnosis with psoriatic arthritis, to the best of Plaintiff's recollection.

68.     Plaintiff was under the impression he could not take off work to vote whatsoever from approximately 12 to 15 years ago through his termination by Defendants' Enterprise. Plaintiff never requested voting leave after that sole instance. Plaintiff does not seek to include this instance of a management level employee   discouraged Plaintiff from exercising his right to obtain voting leave. This is and was an activity protected by Colo. Rev. Stat. Ann. §§ 1-7-102, 1-13-719, 31-10-603, and 31-10-1522—employees are allowed up to two hours to vote if they request it and an employer cannot penalize an employee for exercising those rights.

69.     An employee is entitled to up to two   Plaintiff about his supervisor having authority to grant or deny medical leave, threatened with adverse employment action in the form of assessed points in response to a request to be allowed to arrive a brief time later than his scheduled shift so that he could have an opportunity to vote in a general election, and lied to by

various supervisors about

70.     Defendant Safeway and Defendants participating in the creation of the investigative report related to Plaintiff's termination misstate in multiple instances the date which Plaintiff faced wrongful suspension. This date is represented to be November 16, 2020 when in reality it occurred three (3) days earlier on November 13, 2020. Such a basic error is bewildering to occur but for intentional attempts to misrepresent the date of Plaintiff's suspension and create a false appearance that it was not directly related to his attempts to request and take FMLA medical leave, and to do so without facing adverse employment consequences or retaliation. Further, this is one example of the many instances in which Defendant misstates and misrepresents the date of alleged events surrounding Plaintiff's suspension.

-

71.     Plaintiff is a member of a protected class due to his medical condition of psoriatic arthritis qualifying as a disability under Title VII of

72.     Pretext can be shown by " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.

73.     Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)
74.

75.     Plaintiff was diagnosed with Psoriatic Arthritis on or about September 9, 2009, approximately ten years following his initial date of hire by Defendant. His primary treating physician during the majority of his employment at Defendant Safeway was a rheumatologist whose treatment records reflect the nature and severity of Plaintiff's condition.

76.     This disability made activities of daily life difficult or impossible. Psoriatic arthritis

qualifies as both a disability under the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12102-12213 (the "ADA") and a serious medical condition under the Family Medical Leave Act ("FMLA").

<u>**Violation of ADA - Wrongful termination**</u>

<u>**Outrageous Conduct – Intentional Infliction of Emotional Distress**</u>

1.      Defendants, each of them, engaged in extreme and outrageous conduct in conspiring to create false pretenses to support their desire to terminate Plaintiff's employment— by conduct that aimed to cause a peaceful man as   .

2.      Defendants acted with reckless disregard for Plaintiff's mental and emotional wellbeing in their actions which falsely attributed statements and actions to Plaintiff that are contrary to his character. These statements and actions portrayed Plaintiff as if he were a person of such sinister character that others feared for their lives due to only working in the same warehouse with him—a facility over 1,000,000 square feet in size.

3.      The Defendants individually were not intimidated by Plaintiff. To cause Plaintiff to suffer adverse employment actions including wrongful termination and to thus , Defendants' Enterprise created false reports of Rather, Defendants desired to end Plaintiff's employment because he has a disability in the form of an incurable immune deficiency, and he required intermittent leave from work due to the debilitating and unpredictable nature of this medical condition.

4.      Plaintiff had worked for Safeway for 19 years—since he was 20 years old—and intended to maintain his employment there through his retirement eligibility. Defendants knew that Plaintiff would struggle to find a replacement job due to the nature of his medical condition.

5.      Defendants' investigation and supporting documentation is verifiably false. The staggering effort Defendants engaged in to achieve the unlawful goal of creating a false narrative sufficient to support Plaintiff's termination shocks the conscience. Plaintiff has never been convicted of a crime and has no history of violent behavior. He does not own any firearms. As Defendants admitted in response to Plaintiff's EEOC charge, . Defendants' scheme developed over the course of many months if not years included over fifteen employees of Defendant Safeway ranging from upper management to hourly warehouse workers.

6.      Defendants in the actions described herein acted recklessly and/or intentionally to cause Plaintiff severe emotional distress in these actions.

7.

## COUNT I

### Violations of the Americans with Disability Act

<u>**COUNT II**</u>

**Violations of Colorado Anti-Discrimination Act**

**(Defendant Safeway)**

Violation of C.R.S. § 10-16-1003(3)(b)).

1. Plaintiff was required by Defendant to provide extensive documentation of his disability and treatment by medical professionals throughout the course of his employment with Defendant.
2. Defendant required Plaintiff to submit written statements by his treating physicians to obtain medical leaves of absence. Such documentation was required in each instance of a request for medical leave, regardless of whether such leave was due to an ongoing condition that required intermittent leave.

<u>**COUNT III**</u>
**Violation of the Family Medical Leave Act**
**(Defendant Safeway)(willful)**

1.       Plaintiff was a covered employee under the Family Medical Leave Act (FMLA) during all relevant times of his employment with Defendant. 29 CFR § 825.104.

2.       Defendant Safeway is a private employer and employed more than 50 persons on payroll for more than 20 calendar workweeks during all years Plaintiff was an employee of Defendant.

3.       Defendant employed more than 50 employees at the Denver Distribution Center at all relevant times of Plaintiff's employment. Defendant also employed more than 50 employees within 75 miles of the Denver Distribution Center at all relevant times of Plaintiff's employment.

4.      Plaintiff was a covered employee under the Family Medical Leave Act (FMLA) during all relevant times of his employment with Defendant. 29 CFR § 825.110.

5.      Plaintiff was employed by Defendant for more than 12 months and worked for Defendant for more than 1,250 hours prior to requesting medical leave pursuant to the FMLA.

6.      Plaintiff has and had at all relevant times during his employment with defendant a "serious health condition" including but not limited to psoriatic arthritis.

7.      Plaintiff was diagnosed with psoriatic arthritis on or about September 9, 2009. Plaintiff began to suffer the effects of this condition for many years prior to its formal medical diagnosis. Plaintiff's psoriatic arthritis worsened in severity following his diagnosis in 2009.

8.      Since his diagnosis with psoriatic arthritis in 2009, Plaintiff was under continuing treatment by a health care provider for his condition of psoriatic arthritis. Plaintiff's care was overseen by medical doctors with proper licensure who specialized in rheumatology.

9.      Psoriatic arthritis is a condition for which there is no known cure. Psoriatic arthritis is not treated by over-the-counter medications. The continuing care overseen by a specialist is necessary to treatment of psoriatic arthritis.

10.     Psoriatic arthritis often incapacitated Plaintiff. The unpredictable flare ups of this condition, treatment to address the condition, and/or recovery from the condition or treatment caused Plaintiff to have an inability to work or perform other regular daily activities.

11.     Plaintiff requested medical leave pursuant to the FMLA at various times.

12.     Defendant required Plaintiff to provide documentation from a treating physician for each instance of medical leave he requested under the FMLA.

13.     Defendant's requirements for this documentation is a violation of the FMLA and

amounts to a prohibited discriminatory and harassing action against Plaintiff as its employee.

14.     Defendant was at all relevant times obligated to observe all terms of the CBA as to any way it allowed forgreater family or medical leave rights than those established under the FMLA.

15.     Article 15 "Sick Leave" in the CBA was in effect during Plaintiff's employment with Defendant, including the current iteration effective August 13, 2017 to August 20, 2022. The CBA states, in relevant part:

**ARTICLE 15**

**SICK LEAVE**

15.1    Commencing with the beginning of the first pay period and upon completion of each full month of employment thereafter, each regular full-time non-probationary employee shall be granted a credit of four (4) hours of non-occupational or occupational disability leave with pay at his regular straight-time hourly rate of pay. Said employees can accumulate unused non-occupational or occupational disability leave up to a total of six hundred (600) hours.

16. Plaintiff's entitlement to leave under the FMLA does not affect or negate the protections

Plaintiff is entitled to by the ADA:

"FMLA's legislative history explains that FMLA is "not intended to modify or affect the Rehabilitation Act of 1973, as amended, the regulations concerning employment which have been promulgated pursuant to that statute, or the Americans with Disabilities Act of 1990 [as amended] or the regulations issued under that act. Thus, the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the [ADA], employers who receive Federal financial assistance, employers who contract with the Federal government, or the Federal government itself. The purpose of the FMLA is to make leave available to eligible employees and employers within its coverage, and not to limit already existing rights and protection."

29 C.F.R. § 825.702(a) (*quoting* S. Rep. No. 103-3, at 38 (1993)).

17. Due to Plaintiff's status as a qualified employee with a disability within the meaning of the

ADA, so Defendants were required to make reasonable accommodations which would have allowed Plaintiff to continue his emplo. At the same time, the employer must afford an employee his or her FMLA rights. ADA's "disability" and FMLA's "serious health condition" are different concepts, and must be analyzed separately. FMLA entitles eligible employees to 12 weeks of leave in any 12–month period due to their own serious health condition, whereas the ADA allows an indeterminate amount of leave, barring undue hardship, as a reasonable accommodation." 29 C.F.R. § 825.702(b)

18. "A qualified individual with a disability who is also an eligible employee entitled to FMLA leave requests 10 weeks of medical leave as a reasonable accommodation, which the employer grants because it is not an undue hardship. The employer advises the employee that the 10 weeks of leave is also being designated as FMLA leave and will count towards the employee's FMLA leave entitlement. This designation does not prevent the parties from also treating the leave as a reasonable accommodation and reinstating the employee into the same job, as required by the ADA, rather than an equivalent position under FMLA, if that is the greater right available to the employee. At the same time, the employee would be entitled under FMLA to have the employer maintain group health plan coverage during the leave, as that requirement provides the greater right to the employee." 29 C.F.R. § 825.702(c)(2)

19. Safeway, as a covered employer under the FMLA was obligated to make, keep and preserve records pertaining to its obligations under the FMLA.

20. Defendant Safeway was required to designate leave taken pursuant to the FMLA separate from "sick leave" defined in terms contained the CBA.

21. Defendant was required to specifically maintain, among other records and documents:

    a.    Basic payroll and identifying employee data, including name, address, and occupation; rate or basis of pay and terms of compensation; daily and weekly hours worked per pay period; additions to or deductions from wages; and total compensation paid. 29 C.F.R. § 825.500(c)(1).

    b.    "[r]ecords of any dispute between the employer and an eligible employee regarding designation of leave as FMLA leave, including any written statement from the employer or employee of the reasons for the designation and for the disagreement." 29 C.F.R. § 825.500(c)(7).

22. Defendant failed in numerous ways and over numerous years during Plaintiff's employment to maintain the required records for Plaintiff's requests and periods of leave taken pursuant to the FMLA, including without limitation: by failing to accurately document and falsifying records of the hours Plaintiff worked; by failing to document disputes between Plaintiff and Defendant regarding FMLA leave due to such records being inaccurate, falsified, or never created; by failing to document the many instances when Defendant discouraged Plaintiff from requesting medical leave under the FMLA; by failing to document Plaintiff's supervisors' threats to terminate his employment or place him in a less desirable position if he requested or took leave under the FMLA; and/or in other ways.

23. Defendant Safeway, acting in concert with other Defendants, created documentation of Plaintiff's absences which was deficient and failed to meet applicable standards of the FMLA and other regulations. For instance, rather than documenting the individual individual days Plaintiff requested and took FMLA medical leave, Defendants documented an obviously impossible amount of FMLA leave taking place on a single day. Records

obtained on November 1, 2019 detailing Plaintiff's absence records show 50.0 hours of FMLA leave taken on October 7, 2018, 20.0 hours taken on December 16, 2018.

24. In other instances, Defendant documented consecutive days of absences from work as approved FMLA medical leave, which did not cause him to accrue points on his employment record, followed by unpaid sick leave, which caused him to receive points and thus be subject to an adverse employment action for what should have properly been documented as two days of FMLA medical leave. This is seen on records for absences on January 27, 2019 (FMLA) and January 28, 2019 (sick leave causing points).

25. Plaintiff had specifically been awarded a "floating holiday" by a Supervisor for January 28, 2019. Defendants including to the best of Plaintiff's knowledge Defendant Sean Haley subsequently altered Plaintiff's absence records to change the leave taken on January 28, 2019 into unpaid sick leave.

26. Defendants purposefully utilized instances of FMLA medical leave as the basis for disciplinary warnings and write ups. This is seen on a Written Warning created bt Defendant Sean Haley on November 1, 2019 which states that "Tour absences from your work schedule has reached a level that requires administrative action as outlined in your absentee policy. Over the last 12 month retention period, you have accrued 70 points form missing scheduled workdays for any number of reasons," and, "Continued absence from work can and will lead to termination of your employment."

27. Contrary to the Written Warning Haley created,

28. Defendant failed to maintain records relating to certifications, recertifications and/or medical histories for Plaintiff and his family members which were created for purposed of

FMLA as confidential and separate from usual personal files.

29. Defendant failed to maintain records required under the FMLA in conformance with the requirements of the ADA in many ways including without limitation by informing personnel who were not Plaintiff's supervisors or managers about Plaintiff's restrictions and necessary accommodations.

30. Defendant's failure to comply with the FMLA in conjunction with Plaintiff's requests and leave taken under the FMLA was a continuing violation which first occurred upon the first instance Plaintiff requested leave under the FMLA and continued through his wrongful suspension and termination.

31. The first time….

32. From the time of his first request for leave under FMLA through his suspension and termination, Plaintiff was constantly informed by Defendant's supervisors and managers that requesting and/or taking FMLA leave would result in adverse consequences for Plaintiff and possibly result in his termination.

33. Plaintiff was subjected to numerous adverse employment actions by Defendant in retaliation for requesting and taking leave under the FMLA. The retaliatory actions were far reaching and consistent, including without limitation:

    c.  placing him on a less favorable shift and changing his work hours;

    d.  forcing him to work overtime despite his seniority over employees of Defendant with many less years of experience without sufficient justification for displaying favoritism to these junior employees;

    e.  increasing the difficulty and stress level of his job as a forklift operator by assigning him less favorable tasks on his shifts such as forcing him to move a greatly increased number of items such that he struggled to complete the work and felt compelled to work nonstop, with less or no breaks, and even lacking time to use the restroom. If he failed to meet the demands assigned to him, he would be assigned points and possibly be forced into a less favorable position or face other discipline;

    f.  removing him from his job as a forklift operator, which did not require substantial physical exertion, and placing him in a less desirable position in "order selection" that required constant strenuous physical labor and heavy lifting for entire shifts;

    g.  causing Plaintiff's co-workers to be aware that Plaintiff's schedule changed or he was absent due to FMLA leave, including disclosure of protected medical information under FMLA, ADA, HIPAA and/or other laws and regulations;

    h.  causing Plaintiff's co-workers to hold false beliefs about the nature and existence of Plaintiff's serious medical condition and disability of psoriatic arthritis

    i.  Plaintiff's supervisors and managers agreeing—tacitly and/or expressly—to disparage and retaliate against Plaintiff in order to create an environment which would cause Plaintiff to stop requesting and taking FMLA leave, to voluntarily

terminate his employment, or to cause him to be terminated;

j. Plaintiff's supervisors and managers taking actions in accordance with this common scheme or design in a manner such as Plaintiff by reassigning his job to a more difficult and physically taxing role that required him to work entire shifts in locations that maintained a temperature of less than 40 degrees Fahrenheit;

k. Plaintiff's supervisors and managers changing the nature of Plaintiff's job duties in a manner which caused him emotional distress, mental anguish, and worsened his psoriatic arthritis;

l. Creating and fostering a hostile and degrading work environment for Plaintiff through the dissemination of information—with malicious intent and/or reckless disregard for the consequences to Plaintiff—about Plaintiff's medical leave under the FMLA tin a manner that was prohibited by law and/or patently false +6, thereby causing him to suffer harassment from his co-workers and ;

m. was subject to verbal harassment and negative treatment due to Defendant's supervisors and managers making false and defamatory statements which caused animosity toward Plaintiff from his co-workers

n. Trying to overload him on work by putting him into order selection, to make up for time that he missed on forklift they had to put another person working the second half of the shift on

o. Training – not running around getting boxes moved in a super quick time when you are training, you get to walk with someone and not have to rush around; he's passionate about his work and going to teach people how to do that job well

34. Prior to his shift on November 13, 2019, Plaintiff submitted a written complaint to Defendant detailing Defendant's failure to adhere to the FMLA and stating how Defendant willfully violating the FMLA when Plaintiff requested and took leave. Defendant suspended Plaintiff from his employment following the end of his shift on or about November 13, 2019.

35. Plaintiff witnessed other employees of Defendant at the Denver Distribution Center receive similar retaliation for taking medical leave under FMLA throughout his 19 years working at the facility. Numerous employees voluntarily terminated their employment because of the harsh conditions and negative employment actions they faced after

36. Isaac Garcia used similar knife as an order selector and as a supervisor, one day he let Gavino

WHEREFORE, Plaintiff demands and is entitled to all forms of relief available for Safeway's willful violations of the FMLA, including without limitation all damages suffered to include all lost compensation and all other monetary losses, including the cost of providing substitute care, plus interest; liquidated or double the amount of his actual losses, attorney and expert witness fees; costs of maintaining this action;

**Violations of Federally Mandated Recordkeeping Requirements**

1. Defendant was required under 29 CFR §1602.14 to preserve all records related to Plaintiff's charge of discrimination and retaliation made to the EEOC.

2. Among other requirements, employers are required to preserve personnel records of a person subject to involuntary termination for at minimum one year following the date of termination; and further to preserve all personnel records relevant to a charge of discrimination filed with the EEOC until final disposition of that charge. This means such records are to be preserved through, at minimum, the "date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation is terminated." 29 C.F.R. § 1602.14r).

3. Plaintiff's EEOC charge alleged that Defendant engaged in a continuing violation of the ADA and retaliated against Plaintiff.

4. Defendant received notice of Plaintiff's EEOC charge no later than approximately two months following the date of Plaintiff's termination.

5. Defendant received notice from Plaintiff via a voicemail left for Defendant L.D. on December 10, 2020 that Plaintiff was represented by private counsel to pursue legal action related to Plaintiff's termination. On December 11, 2020, Plaintiff's counsel informed Defendant Safeway's counsel via telephone call that the present litigation was forthcoming.

6. Beginning in the months prior to his termination and continuing through the filing of this lawsuit, Plaintiff requested various specific records from related to his employment and termination including documentation concerning actions, communications, investigations, licensures, statements, timekeeping and payment records, video recordings, and other items from Defendant. Defendant has failed to provide nearly all of the requested records.

7. Items which Defendant failed to produce include records which were created or should have been created in the course of Defendant's regular business operations and/or as part of the investigation process preceding Plaintiff's suspension and termination. Various other items Defendant failed to produce include items the CBA specifically contemplates Defendant as being obligated to create and preserve.

8. Defendant's failure to produce certain items upon Plaintiff's request or at the request of the Teamsters Union Representative and counsel is reason to believe that Defendant intentionally destroyed—or may have never created—certain records it was obligated to preserve.

9. Plaintiff will be prejudiced and deprived of a full and fair opportunity to pursue his claims in this matter to the extent Defendant intentionally acted to deprive Plaintiff of evidence by this destruction of records.

10. Additionally and alternatively, the false, misleading and defamatory nature of the investigation materials obtained from Defendants are reason to believe Defendants edited, altered, amended, or otherwise changed records relating to Plaintiff's employment and in

doing so knowingly and intentionally provided false documentation with the purpose of creating the false appearance of justification to terminate Plaintiff's employment.

11. Defendants are unable to produce the original electronic files included with the report allegedly authored by A.J. which Defendants claim to be results of an investigation that preceded and resulted in Plaintiff's termination

12. Defendants have failed to produce the original unedited electronic files for the report allegedly authored by A.J., as well as all documents and records referenced therein and claimed to have been reviewed or created during the investigation that preceded and resulted in Plaintiff's termination, including all associated or available metadata and file history information such as the date and time originally created and last modified, method of transmission by which each file came to be in Safeway's possession, and information sufficient to identify the device on which the file was created.

13. Plaintiff was prejudiced and deprived of a full and fair opportunity to pursue his claims in this matter to the extent Defendant intentionally acted to create, alter, edit, or otherwise misrepresent the date, author, or any other information related to the documents which Defendants allege supported Plaintiff's suspension and termination.

14. The destruction of such records amounts to spoliation of evidence. The most reasonable conclusion that can be reached in this situation is one of an adverse inference against Defendant—that the contents of such records were damaging to Defendant's defenses and/or supportive of Plaintiff's claims.

15. The EEOC failed to investigate the existence of such recordkeeping violations as part of its investigation into Plaintiff's charge of discrimination as is contemplated by 29 C.F.R. § 1602.56.

16. Defendants who actively took part or engaged in the recordkeeping violations alleged herein include to the best of Plaintiff's knowledge and based upon available documentation, at minimum, Defendants including Safeway, A.J., S.H., K.H., A.L., and L.D. Certain of the John Doe Defendants 1-20 and all additional individual Defendants were involved either tacitly or should have known of their roles in violating the recordkeeping requirement.

WHEREFORE Plaintiff respectfully requests that Defendant's failure to produce in this matter any records which Defendant was obligated to create or maintain under applicable laws and regulations cause this Court to enter an adverse inference against Defendant and in favor of Plaintiff that such evidence would have supported Plaintiff's claims and would not have supported Defendant's defenses.

## COUNT V

## Civil Conspiracy

**<u>Count VII</u>**

**Violation of the Colorado Anti-Discrimination Act**

1. Defendant's actions in discriminating against Plaintiff throughout the course of his employment and terminating him wrongfully under false pretenses caused Plaintiff to suffer substantial emotional pain and suffering, inconvenience, mental anguish and the loss of enjoyment of life.
2. Defendant's discriminatory actions in violation of CADA created a hostile work environment for Plaintiff for reasons including but not limited to that he was subject to constant ridicule and poor treatment by co-workers and management for his use of medical leave; employees insulted Plaintiff's physical appearance when his disability resulted in visible skin lesions and plaques; he was actively discouraged from requesting leave for medical reasons for both his own disability and family medical issues; and
3. , caused a disparate impact to Plaintiff
4. Defendant did not make any good faith effort to identify and/or make a reasonable accommodation for Plaintiff's disability.

WHEREFORE Plaintiff demands and is entitled to all forms of relief available under CADA including compensatory damages in an amount to be determined by the jury for all economic and non-economic damages incurred, pre- and post- judgment interest, attorneys fees…

**Violation of the Colorado Employment Security Act**

Fees and costs

**Violation of Racketeer Influenced and Corrupt Organizations Act (RICO)**

1. An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 945–46 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)).
2. Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).
3. The Defendants Enterprise was at all relevant times a group of persons associated together for a common purpose of engaging in a course of conduct.

**E. DISCRIMINATION UNDER TITLE VII**

6. Plaintiff is an employee within the meaning of Title VII and belongs to a class protected under the statute, namely his disability status due to psoriatic arthritis, and as a person of Hispanic descent. Plaintiff was a forklift driver { *See* 42 U.S.C. § 2000e(f).}

7. Defendant is an employer within the meaning of Title VII, is engaged in an industry affecting commerce, and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year. *See* 42 U.S.C. § 2000e(a), (b)*; Arbaugh v. Y&H Corp.*, 546 U.S. 500, 504–05 (2006).}

16. As a direct and proximate result of defendant's conduct, plaintiff suffered the following injuries and damages in addition to those described throughout the Complaint:

**G. ATTORNEY FEES & COSTS**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in favor of Plaintiffs:

1. For back pay due to Plaintiff's willful violations of the FMLA and ADA
2. For front pay due to Plaintiff's violations of the FMLA and ADA
3. Liquidated damages for Defendants' willful violations of the FMLA and ADA
4. Compensatory damages for Plaintiff's physical injury, emotional distress, and pain and suffering.
5. Punitive damages for Defendants' willful violations of the FMLA and ADA
6.  Trebled damages for the injuries
7. Fees and cots

For compensatory damages for damage and injury to business or property in an amount as yet undetermined,

2. For damages for injury to business or property trebled in accordance with 18 U.S.C. § 1964(c),

5. For reasonable attorney fees in accordance with 18 U.S.C. § 1964(c), and

6. For costs of investigation in an undetermined amount, trebled in accordance with 18 U.S.C. § 1964(c).

**DATED** this 25th day of December, 2020.

Respectfully Submitted,

LAW OFFICES OF JOHN D. HALEPASKA, LLC

By: *s/ Joseph Ryan Riegerix*

Joseph Ryan Riegerix
John D. Halepaska
600 17th Street, Suite 2800 South
Denver, CO  80202
Tel: (303) 228-7179
Fax: (303) 496-0194
joe@halepaskalaw.com
john@halepaskalaw.com